## PRELIMINARY STATEMENT

This case is relatively straight forward.  The Plaintiff, Said Hajem, is a Muslim American, who was born in Morocco.  He applied to become a member of New York's Finest, the New York City Police Department ("NYPD") because he wanted to use his language skills to help protect the citizens of New York from terrorists and Muslim extremists.  He has the three qualifications necessary to become a member of the NYPD, age, education, and citizenship.  During one of his interviews, which happened on the 4th of July, with an investigating officer, that officer, Defendant Ramkissoon, effectively called Mr. Hajem a terrorist.  After that event, Defendant Ramkissoon, told Mr. Hajem he was not hired.  End of story.  Defendants thereby violated 42 U.S.C. § 2000e-2(a)(1) which makes it an unlawful employment practice to "fail or refuse to hire … any individual, or otherwise discriminate against any individual …because of such individual's race, color, religion, sex, or national origin."[1]

## PRELIMANARY ISSUES

### The Declaration of Mary Boykin Must be Disregarded.

The Defendants attempt to now submit the Declaration of Mary Boykin.  Ms. Boykin is a Sergeant with the New York City Police Department.  Any facts sworn to solely by Ms. Boykin must be ignored in their entirety.  Plaintiff received no notice of the existence of this individual and whatever relevant knowledge she may possess prior to the close of discovery.  Her name was never listed in any Rule 26 disclosures. (Rankin Declaration of March 26, 2009 Ex. 1( hereinafter all exhibits shall refer to the Rankin Declaration unless otherwise stated).   Her name was never mentioned in any depositions. (Rankin ¶ 3).  Further, the Declaration was submitted over a full six months after the

---

[1] As well as a violation of Plaintiff's civil rights under 42 U.S.C. § 1983.

close of discovery and Plaintiff has had no opportunity to examine this witness. (Rankin ¶ 4).  See, Fleet Capital Corporation v. Yamaha Motor Corporation, 2002 U.S. Dist. LEXIS 17502 *2 - 3 (S.D.N.Y. September 19, 2002) (observing that, "Rule 37(c) provides an almost automatic sanction for a failure to disclose under Rule 26(a)," and that any party who fails to disclose or amended without "substantial justification" is not permitted to use on any motion)

### Sections of Rosario Affidavit Must be Discarded.

The Defendants seek to introduce documents from P.O. Rosario that were specifically excluded from this litigation pursuant to your Honor's Order of March 2, 2009, Ex. 2.  Plaintiff moves to strike all of ¶¶ 8 – 23 in their entirety.  These are facts and occurrences that allegedly happened after discovery closed on August 18, 2008.  Plaintiff had no opportunity to examine this witness on these matters.  Accordingly, Exhibits BB, CC, DD, FF, GG, and HH must also be removed from the record as documents that were not produced within the discovery deadline.

### Exhibit C to the Miller Declaration Must be Removed.

Exhibit C is a "Notice of Examination."  This notice of examination has never been produced before being attached to this declaration.  The court will notice the conspicuous lack of a bates number on this document.

### Withdrawn Claims.

Upon review of discovery, Plaintiff acknowledges there is not enough evidence to proceed with a Monell v. Dep't of Social Services, 436 U.S. 658 (1978) claim against the City of New York.  Further, Plaintiff withdraws, the 42 U.S.C. § 1983 claim against Commissioner Raymond Kelly for the same reason.   For clarity of the record, Plaintiff

also withdraws the Title VII claim against Defendant Ramkissoon in his individual capacity.

### 42 USC § 1983 Claim Against Ramkissoon

Plaintiff does not contest that the same legal analysis applying to the Title VII claim should also apply to the 42 USC § 1983 claim against defendant Ramkissoon in his individual and professional capacity.

## STATEMENT OF FACTS

Said Hajem, like many people from other nations, came to the United States seeking a better life. Said Hajem is a Muslim American from Morocco. (Deposition of Said Hajem Ex. 3 (hereinafter "Said Hajem") 79:13-14 and 11:12-17). Said Hajem, like many of his peers, worked as a taxi driver and a waiter and went to school on his limited free time. Said Hajem earned a bachelor's degree in his home county of Morocco. (Said Hajem 13:15 - 6). Hoping credentials from an American school would serve him better, Said Hajem attended La Guardia College and the Spanish American Institute. (Said Hajem13:20 – 14:10). During this time he was working on becoming a naturalized citizen. In the beginning of 2006, Said Hajem became an American citizen. (Said Hajem 25:11 – 14 and Ex. 16).

In late 2005 Plaintiff saw an episode of the television show 60 Minutes where the New York City Police Department was seeking qualified individuals who spoke Arabic to assist in the counter terrorist efforts of the Department. (Said Hajem 23:14-18, 23:23-25). Said Hajem, who was and is extremely grateful to his new city, decided that he should join the NYPD where he hoped to use his ability to speak Arabic and French to the benefit of the City. Said Hajem states, "[o]ne e-mail [from an internet job site] said

New York City needs you, so I didn't hesitate, I applied and said I am going to serve and help people. (Said Hajem 23:18-21).

Said Hajem applied to become a member of the NYPD during the end of 2005. (Said Hajem 23:3-5). Said Hajem completed all of the written portions of the Police Department Application on May 15, 2006. (Ex. 4). Said Hajem received a passing score of 85.882 on the Civil Service examination necessary to become a New York City Police Officer. (Ex. 5). On May 18, 2006, Said Hajem took and passed a written psychological examination that lasts approximately eight (8) hours. (Ex. 6). On May 24, 2006, Said Hajem took and passed the physical evaluation given by the NYPD. Exhibit 8 (Deposition of P.O. Ramkissoon, hereinafter "Ram.") 89:10: 90:10) On June 14, 2006, Said Hajem took and passed a medical examination that lasted approximately four (4) to five hours. (Exhibit 7). Said Hajem fulfilled the department's age requirement. (Ex. 28.)

Said Hajem was slated to become a New York City police officer on probationary status. On June 14, 2006, Said Hajem executed two documents. The first is titled "Appointment Subject to Investigation." (Ex. 11). The second document bears the title "Police Officer Terms of Probation Statement." (Ex. 12 ). While these documents are not conclusive proof that Said Hajem was qualified for the position of a Police Officer, they do absolutely show how far along in the process Said Hajem was and could be read by a Jury to indicate that Said Hajem had actually been hired.

On June 28, 2006, Police Commissioner Raymond W. Kelly sent Said Hajem a letter stating, "I want to congratulate you on passing the Police Department Examination and well as the other requirements to become a member of the finest. I look forward to meeting you when you take the other of office to be a New York City police officer."

(Ex. 10). This letter could be taken by a jury as it was taken by the Plaintiff, to show that Said Hajem had been hired as a police officer.

## Two Meetings with Police Officer Ramkissoon

### May 25, 2006

On May 25, 2006, Said Hajem met with P.O. Ramkissoon. (Ram. 51:2 – 53:20; Hajem 38:5-6). As would be normally expected, this meeting involved Ramkissoon talking to Said Hajem about what items were missing from his application packet. At this meeting, Ramkissoon gave Said Hajem an Acknowledgement of Instruction form. (Ex. 13). This form told Said Hajem the items necessary for Said Hajem to complete his file. The documents were an Original Birth Certificate, Insurance Company letter for accident, address for all schools in Morocco, dates of birth for all family and friends, and payment to "IRS for tax evasion." (Ex.13).

Said Hajem provided documents responsive to this request. See Exs 4, 14, 20, and 23. Ramkissoon's understanding of the so-called tax issue is not complicated at all. Ramkissoon was creating a false issue despite the mountain of evidence to suggest that no such problem existed, or if it did, it was merely a pretext to cover for his discriminatory animus. A jury could easily conclude that Ramkissoon's handling of the tax issue was a pretext for his discrimination against Said Hajem. On May 25, 2006, Said Hajem brought with him to the interview with Ramkissoon a complete set of his tax documents (Said Hajem 53: 3 - 54:6 and Exs. 19 and 29). Nowhere in the tax documents was there any indication that Mr. Hajem had underpaid his taxes. In fact, the tax records showed Said Hajem was paid in cash and Said Hajem had reported the payments and paid taxes on that income. (Said Hajem 55:6 – 15). Ramkissoon's reaction to this clear

evidence shows that something else was going on and a jury could easily determine it was his prejudice against Muslim Americans or people from Muslim countries.

### July 4, 2006

The July 4, 2006 interview with Ramkissoon is where the direct evidence of discrimination takes place.  Said Hajem is called a terrorist and informed he will not be hired because of his national origin.  On the morning of July 4, 2006, Said Hajem was planning on going to visit his (now) wife's family in Connecticut. (Said Hajem 44:6 – 9). Ramkissoon called Said Hajem early in the morning and left a message. (44:1 - 2).  Said Hajem called Ramkissoon as soon as he got up.  Ramkissoon said that Mr. Hajem should "come down right now" to New York City from Kathonah, where he was staying with his (now) wife, Marcie McGowan. (Said Hajem 44:7)  So, Said Hajem and Marcie McGowan canceled their plans with her family, got in a car and drove down to New York City. (Said Hajem 44:25 – 45 : 12).  Said Hajem stopped by his apartment to get documents requested by Ramkissoon. (Said Hajem 45:1 - 5)

When Said Hajem arrived at the applicant processing center, he gave Ramkissoon a list of his neighbors' names and phone numbers.[2] (45:3 – 15)(Ex. 20).  Ramkissoon replied, "'what is this?'  He told me 'those are names are Middle Eastern.  Those names are not American.  I want American names.'  I told him sir, 'those are American citizens.' He told me 'no, I want you to bring me American names, because you maybe a terrorist and those people may say good things about you if I call them.'"(Said Hajem 45:14 – 21, 48:20 – 49:2, 55:3 - 22, and 58:11 – 25).  At the end of this exchange Ramkissoon asked

---

[2] Ramkissoon had asked for this information on the phone that morning, but Said Hajem had already sent this information to Ramkissoon.  Said Hajem produced the documents again at Ramkissoon's request.

Said Hajem where he is from[3] and told Said Hajem, that "I am against people who came from other countries and want to be police officers." (Said Hajem 45:23 – 46:1). After that, Ramkissoon repeated his demand that Said Hajem give the IRS money. (Said Hajem 48:1 - 19). Said Hajem had shown Ramkissoon receipts for his tax payments, but Ramkissoon,

> didn't give me a chance, especially when he said what he said, so, um, I went back to the IRS. I didn't want to argue or to convince him, because, you know, he knew what he was doing, he thought.
> Q:    What do you mean?
> A:    Um, after what he said, "I am against people who come from other countries and want to be a police officer," after he said I am a terrorist and after I showed him the document saying I don't owe any money from the IRS and after I proved that I am a good citizen because even though I get paid in case, I pay my taxes at the end of the year. I showed him I am an honest man, and he keeps saying something. "Nobody will understand it. Go and give them some money." (Said Hajem 54:22 – 55:11)

After Said Hajem left the Application Processing Division, he was crushed. Mr. Hajem states, "[h]e destroyed me when he said that." (Said Hajem 49:1-2). P.O. Ramkissoon denies any recollection of the events on July 4, 2006, where the terrorist comments were made. (Ram. 72:21 – 74:13). However, Ramkissoon checked off 13 of the 24 items on the Investigator's Inquiry Checklist on July 4, 2006. Ex. 27. His testimony does not explain how he could have done so much work on the case that day and still had no recollection of the substance of his conversation with Mr. Hajem or what he did that day.

## Post July 4, 2006

On July 6, 2006, Said Hajem revisited the IRS (Said Hajem 56:1 - 6). Said Hajem went back to the IRS and explained the situation to the IRS agent. The IRS agent began to laugh at what Said Hajem was asking him to do, explaining, "it doesn't work like that.

---

[3] Said Hajem answers that he is originally from Morocco. (Said Hajem 45:24)

They asked me what I do.  I said 'I drive taxi, and I clean tables.' They said you are self employed?  I said 'right.'" (Said Hajem 47:17 - 20).  The IRS agent gave Said Hajem a document to send to Ramkissoon, along with copies of all the 1099 forms Said Hajem filed over the years in question. (Said Hajem 47:21-23)(Exs. 18, 19, and 29) Said Hajem mailed the documents to Ramkissoon. (Said Hajem 56:7).

Said Hajem had provided Ramkissoon all of the items that Ramkissoon had requested. (As evidenced by the fact that Rosarrio did not request any of the same items, see Ex. 13 and Ex. 24).  Said Hajem was hoping someone would notify him to report to the police academy despite Ramkissoon's clear opposition to his appointment.  In a typical year, the Police Academy begins twice a year, once at the end of July and once in January.  When no one notified Said Hajem about the July class, he assumed that he was still being investigated and would be notified for the January class. (Said Hajem 57:7-12).

On February 1, 2007, when Said Hajem had not heard from any one including Ramkissoon for over six months, Said Hajem called Ramkissoon to inquire about what was going on. (Said Hajem 57:12).

> On February first he picked up the phone, and I told him, 'can I speak to Officer Ramkissoon?' He says, 'speaking, who is this?'  I told him 'this is Said Hajem." He told me 'what do you want?'  I said 'I just want to follow-up and see what is happening with my application.'  He told me 'we chose not to hire you.'  I said, 'excuse me? What did you say?' He said, 'we chose not to hire you,' and he hung up the phone. (Said Hajem 57:17 - 24).

Ramkissoon denies this event took place.  (Ram. 114:24)  After Said Hajem heard this from Ramkissoon, he filed a complaint with the police department utilizing the online complaint form.[4]  (Ex. 21 and Said Hajem 58:6 - 25).  The next communication

---

[4] Complaint form is located at: http://www.nyc.gov/html/mail/html/mailnypd.html

Said Hajem received from the New York City Police Department was not an officer following up on his complaint that he was discriminated against, but a letter saying his application was currently under review.  This letter is dated March 8, 2007.  (Ex. 22) Said Hajem interpreted this to mean he was not going to get the job as a police officer, "if someone has my qualifications [education and language skills] and you need him, you send me a letter and say wait until 2010?  I am looking for a job, and I am right here, and you need people with my qualifications, and there is a position for me, a position.  The City needs cops, the City is short of cops." (Said Hajem 60:6 - 12).

Mr. Hajem filed a charge of discrimination against the New York City Police Department on April 15, 2007[5] with the Equal Employment Opportunity Commission. (Ex. 23).  On October 24, 2007, counsel filed the instant complaint.

The next time the New York City Police Department contacted Said Hajem was to schedule an interview on the day of his deposition with the City's attorneys in this case.  The letter sent by P.O. Rosario is dated July 22, 2008. (Ex. 24).  This is some 573 days from when Ramkissoon told Mr. Hajem that he was not hired and over a full two years after Ramkissoon and Said Hajem meet on July 4, 2006.  Ramkissoon testified that it is "absolutely unusual" for there to be no contact between a candidate and an Investigator for the length of time.  (Ram. 111:15 – 111:17).  The documents that P.O. Rosario requested from Said Hajem are totally different from the documents requested by Ramkissoon.  (Ex.13) (Ex. 24).  The two documents requested by P.O. Rosario, in July of 2008, had never before been specifically requested by a member of the New York City Police Department before that date. (Said Hajem 96:15 - 23).

---

[5]     It is also possible that the EEOC complaint was filed on April 16, 2007.

## The Case Review Sheet

The case review sheet is strong evidence to show that P.O. Ramkissoon had a discriminatory motive in refusing to hire Mr. Hajem.  (Ex. 27). First, the date on the document is July 5, 2006, a mere day after Ramkissoon called Said Hajem a terrorist and completed his work on the Investigator's Inquiry Check List (Ex. 27).  One day is clearly not enough time for Said Hajem to have remedied any of the items that were allegedly out standing at that point.  Second, it shows Ramkissoon knew about the Summons for Accepting on Hail, but never raised the issue with Said Hajem.  (Said Hajem 99:8-17).  Said Hajem states that had someone talked to him about the Summons at that time he would have told them all about it.

> Q:  If someone had talked to you or asked you about the summons, would you have explained to them the circumstances of getting the summons?
>
> A:  Oh, of course, yes.
>
> (Said Hajem 99: 14 - 17).

Looking to the next page we see that Ramkissoon where it says "Debts – Financial Status, sub A) Excessive debts," Ramkissoon marks "no," but then makes the note "unk." presumably standing for "unknown."  What is instructive about this is that Ramkissoon does know about Said Hajem's debt.  On May 25, 2006, Said Hajem makes a candidate statement telling Ramkissoon that he has (four) 4 credit cards with a total balance of around $200.00.  (Ex. 30).  Why then did Ramkissoon put unknown?  This give plaintiff a clear inference of discrimination.  Turning to page (three) 3, at the very top of the page, Ramkissoon writes "This candidate was naturalized a US Citizen only FOUR MONTHS AGO.  However, the candidate satisfies the ELEMENTS." (Emphasis is from

Ramkissoon) (Ex. 25, Pg. 3). Looking at Element 1, Ramkissoon states there was an undisclosed address. Nowhere in the record is there an indication Ramkissoon asked Said Hajem to clarify this issue. At no time did Ramkissoon ever ask Said Hajem for his official transcripts or bring to his attention at a meeting these were missing. (Ex. 25). The first time Said Hajem is made aware of this is when he received the July 22, 2008 letter from P.O. Rossario. (Ex. 24). Element 3 indicates "Tax Evasion for approximately Five (5) years." Ramkissoon knew this was not the case based upon the first letter from the IRS and conversations with Said Hajem. (Ex. 18 and Said Hajem 53: 3 - 54:6). Element 4E shows that Ramkissoon knew about the summons Said Hajem received, but failed to address the issue with Said Hajem. (Said Hajem 99: 14 – 17). Again, Ramkissoon is sandbagging Said Hajem with this case review sheet. Element 5 is a troubling because Ramkissoon interjects his own opinion regarding Said Hajem's non-existent medical condition. Ramkissoon states, Mr. Hajem was twitching. Ramkissoon alerted the NYPD medical staff to this, but Said Hajem went to see Janna Amelkin,[6] Ph. D. on two (2) separate occasions. On May 30, 2006, the NYPD psychologist found Said Hajem to be "Psychopathologically Suitable." (Ex. 6). On June 29, 2006, Said Hajem went back to psychologist. There, Said Hajem was found to, "relate well to the undersigned and there is no evidence that his eye movements + (unreadable) would interfere with police work." (Ex. 26) Looking to the final comments, Ramkissoon mentions, tax evasion, college transcripts, the summons, and a medical condition. Every one of these issues was either not addressed to Said Hajem or there was clear evidence the issue was pretextual. Further, Ramkissoon fails to mention that Mr. Hajem speaks Arabic and French. This is clear evidence that could be easily construed by a jury to have

---

[6] The name is hard to make out, but I believe this is accurate. Refer to exhibit for clarification.

been a pretextual way to cover up for the horrid comments uttered by Ramkissoon to Said Hajem.

## FRCP 56 STANDARD

Under FRCP 56(c), summary judgment should be granted only "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Catlin v. Sobol, 93 F.3d 1112, 1116 (2d Cir. 1996) ("A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law").

The burden on this summary judgment motion is on the movant to demonstrate there are no genuine issues of material fact. Adickes v. Kress & Co., 398 U.S. 144 (1970); see, Celotex Corp. v. Catrett, 477 U.S. 317, 323, 235 (1986) ("[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case").

The non-movant's evidence is entitled to belief, the non-movant is entitled to have all ambiguities and inferences resolved in his favor, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Catlin v. Sobol, 93 F.3d 1112, 1116 (2nd Cir. 1996); Borkowski v. Valley Central Sch. Dist., 63 F.3d 131, 144 (2nd Cir. 1995).

If there is evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party with respect to a material fact as to which the

moving party contends there is no dispute, summary judgment is improper.  Brady v. Town of Colchester, 863 F.2d 205, 211 (2nd Cir. 1988).

Summary judgment is "ordinarily inappropriate where an individual's intent and state of mind are implicated." Meiri v. Dacon, 759 F.2d 989, 998 (2nd Cir. 1985), citing Patrick v. LeFevre, 745 F.2d 153, 159 (2nd Cir. 1984) ("This Court has consistently held where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable").

Trial courts must be "especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." Belfi v. Prendergast, 191 F.3d 129, 135 (2nd Cir. 1999).  "[I]n a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate." Rosen v. Thornburgh, 928 F.2d 528, 533 (2nd Cir. 1991); see also Rivera v. Choice Courier Sys., 2004 U.S. Dist. LEXIS 11758 (S.D.N.Y. 2004) (summary judgment was inappropriate on religious discrimination claim because there was a material question as to whether any accommodation was offered).

## POINT I

### PLAINTIFF HAS DIRECT EVIDENCE OF DISCRIMINATION

At the outset, defendants identified the wrong governing standard.  Under Title VII, "[a] plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury...." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir.2004).

Direct evidence is evidence which "shows that the impermissible criterion played some part of the decision-making process." Barbano v. Madison County, 922 F.2d 139, 145 (2d. Cir. 1990), citing Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989); Grant v. Hazlett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir.1989); see also Griffith, 387 F.3d at 736 ("'direct' refers to the *causal strength of the proof*, not whether it is 'circumstantial' evidence") (italics added).

Once a job candidate establishes by direct evidence that an illegitimate factor played a motivating or substantial role in employment decision, the burden is properly placed on employer to prove by *preponderance of evidence*, not merely a burden of production of a non-pretextual reason, that the same employment decisions would have been made absent discrimination.  Barbano, 922 F.2d at 145; see also Price Waterhouse, 490 U.S. at 252-53 (1989) ("We are persuaded that the better rule is that the employer must make this showing by a preponderance of the evidence").

In Price Waterhouse, Justice O'Connor explained that, in the presence of direct evidence of the employer's consideration of an impermissible factor, the employer has forfeited the "presumption of good faith concerning its employment decisions.  [A]t this point the employer may be required to convince the factfinder that, despite the smoke, there is no fire." Price Waterhouse, 490 U.S. at 266 (O'Connor, J., concurring); see also id at 265 ("More importantly, as an evidentiary matter, a reasonable factfinder could conclude that absent further explanation, the employer's discriminatory motivation 'caused' the employment decision") (O'Connor, J. concurring).

In <u>Barbano</u>, the Second Circuit affirmed the district court's finding of such "direct evidence" of sexual discrimination where there was evidence that a hiring committee repeatedly asked female job candidate questions concerning her plans on having family and whether her husband approved of her taking the job.  <u>Barbano</u>, 922 F.2d at 145-46 (also affirming district court's finding that employer had not met burden of showing, by preponderance of evidence, that employer would not have hired the woman even if they had not discriminated against her).

Like <u>Barbano</u>, the facts of this case clearly demonstrate the presence of direct evidence of discrimination against the Said Hajem.  He took and passed the Civil Service Exam, the written psychological exam, a physical evaluation, and medical exam. (Exs. 5,6,7, and 9) Police Commissioner Raymond W. Kelly sent Said Hajem a letter congratulating him on meeting the requirements to become a New York City police officer. (Ex. 10)  Said Hajem, in response to requests by P.O. Ramkissoon, provided the required documentation to complete his application packet. (Ex.13) Then, at his next meeting with P.O. Ramkissoon, upon presenting him with a list of references, the officer said "those are names are Middle Eastern.  Those names are not American.  I want American names."  P.O. Ramkissoon also told Said Hajem that "you may be a terrorist." Moreover, P.O. Ramkissoon then directly asked Said Hajem where he was from; upon being told that Said Hajem was from Morocco, Ramkissoon said, "I am against people who came from other countries and want to be police officers." (Said Hajem 45:14-21, 48:20-49:2, 55:3-22, 58:11-25) Six month passed without P.O. Ramkissoon contacting Said Hajem.  Finally, in January 2007, P.O. Ramkissoon twice told Said Hajem that "we chose not to hire you," then hung up the phone on Said Hajem. (Said Hajem 57:17-24)

Plainly, these facts are direct evidence that the defendants chose not to hire Said Hajem based upon his national origin.  Based upon these grounds alone, defendants' motion for summary judgment should be denied, as defendants have forfeited a presumption of good-faith.  The defendants, then, must convince a *jury*, by a proponderance of the evidence, that their hiring decision was not motivated by discriminatory animus.

## POINT II

### PLAINTIFF HAS PRESENTED A *PRIMA FACIE* CASE OF DISCRIMINATION

"The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal."  Scaria v. Rubin, 117 F.3d 652, 654 (2nd Cir. 1997), citing St. Mary's Honor Ctr. v. Hicks, 509 US 502, 506 (1993); Burniche v. General Electric Automaton Services, 306 F.Supp.2d 233, 239 (N.D.N.Y. 2004) ("The Second Circuit has 'often emphasized' that the initial burden borne by a Title VII plaintiff is 'minimal'), citing McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2nd Cir. 2001); Texas Department of Community Affairs v. Burdine, 450 US 502, 506 (1981); Fisher v. Vassar College, 114 F.3d 1332, 1335, n7 at 1340 (2nd Cir. 1997) (en banc) ("A quick search in the Westlaw database revels more than one hundred published opinions in which federal appellate courts have characterized the burden of establishing a McDonnell Douglas *prima facie* case as 'minimal,' '*de minimis*,' or 'not onerous'").

Adverse employment actions are not limited to "pecuniary emoluments."  Preda v. Nissho Iwani Am. Corp., 128 F.3d 789, 91 (2nd Cir. 1997).  Negative employment evaluations may also be considered adverse.  Bernheim v. Litt, 79 F.3d 318, 327 (2nd Cir. 1996); accord Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999) (adverse employment actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay,

and reprimand"), cited in Treglia v. Town of Manlius, 313 F.3d 713, 720 (2nd Cir. 2002)

(negative employment evaluation letters considered adverse employment actions if

sufficiently linked to retaliatory animus) and Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,

263 F.3d 208, 223 (2nd Cir. 2001).

Plaintiff has made out a *prima facie* case of discrimination under Title VII of the

Civil Rights Act of 1964, because Plaintiff has shown that (1) he is a member of a

protected group, (2) who is qualified for his position, (3) and who suffered an adverse

action, (4) under circumstances giving rise to an inference of discrimination.  Feingold v.

State of New York, 336 F.3d 138, 152 (2nd Cir. 2004); Shumway v. UPS, Inc., 118 F.3d

60, 63 (2nd Cir. 1997).

**Said Hajem is a Member of a Protected Class**

Defendants make no argument that Said Hajem is a member of a protected class.

**Said Hajem is Qualified to be a Member of the NYPD**

Said Hajem is qualified to be a member of the NYPD.  In reviewing the

qualification prong of a prima facie case, Judge Koeltl reminds us the "Court of Appeals

has warned that district courts should not interpret the qualification prong so 'as to shift

onto the plaintiff an obligation to anticipate and disprove, in [his] prima facie case, the

employer's proffer of a legitimate, non-discriminatory basis for its decision.'

Consequently, 'the qualification necessary to shift the burden to [the] defendant for an

explanation of the adverse job action is minimal.'"  Vinson v. The City of New York,

2007 U.S. Dist. LEXIS 23550 *16 (S.D.N.Y. March 28, 2007) citing, Slattery v. Swiss

Reinsurance Am. Corp., 248 F.3d 87, 92 (2nd Cir. 2001).

There is no allegation or mention that Plaintiff could not work for the New York City Police Department.  All the Defendants are arguing is Said Hajem was not providing documents at a certain time, therefore he was not eligible to be hired.  It is instructive to review the cases cited to by the Defendants.  The Defendants cites to <u>Ogodor v. City of New York</u>, 2991 US Dist. Lexis 2026 (S.D.N.Y. Feb. 26, 2001).  The plaintiff in Ogodor applied for a job to be a caseworker at the Administration for Children's Services ("ACS").  One of the qualifications for this job is the ability to write, read, and understand English.  Mr. Ogodor did not pass the English proficiency section of the hiring process.  Clearly, understanding English was a necessary component of working for ACS in New York City.

The next case the Defendants look to is <u>Jiggetts v. Laguardia Airport</u>, 2007 U.S. Dist. LEXIS 28031 *15-*17 (E.D.N.Y. March 30, 2007).  Here the plaintiff did not complete training to become a transportation and security agent because he was sent home for being intoxicated during a training.  Plaintiff was asked to return to training the next day, but refused.  Clearly, not being willing to be trained for a job makes one disqualified for that job.

The Defendants then turn to the afore cited <u>Vison v. City of New York</u>, 2007 U.S. Dist. LEXIS 23550 (S.D.N.Y. March 28, 2007).  There the plaintiff lied about having a bachelor's degree when that was a prerequisite for being employed as an investigator and then sued after she was fired.

These cases are so wildly different than the facts at bar as to show that what is required to grant summary judgment on the qualification prong of a prima facie case, is a total bar from qualification for employment.  Said Hajem would fail this prong, if he was

not a citizen, of an incorrect age, or did not score highly enough on the Police Civil
Service Exam.  Plaintiff passed all of these requirements.  Said Hajem was told by Police
Chief Kelly that he had "pass[ed] the Police Department examination as well as the other
requirements to become a member of the Finest." (Ex. 10).  As of July 6, 2006, Said
Hajem had provided all of the documentation requested of him.  As of July 2008, there
were only two documents requested of SH. ().  There is at the very least a triable issue of
fact on the issue of Mr. Hajem's qualifications to be a member of the New York City
Police Department.  A reasonable jury could easily conclude that he was qualified for the
position.

### Plaintiff Suffered an Adverse Employment Action

On February 1, 2007, Said Hajem called Ramkissoon and Ramkissoon told him
he was not hired. (Said Hajem 57:17-24).  This is a black letter example of an adverse
employment decision.  Defendants thereby violated 42 U.S.C. § 2000e-2(a)(1) which
makes it an unlawful employment practice to "fail or refuse to hire … any individual, or
otherwise discriminate against any individual …because of such individual's race, color,
religion, sex, or national origin."  We can go straight to the statute and end our analysis
there. He was not hired.

It is instructive to look at what constitutes an "adverse employment action" in
Carter v. State of New York, 151 Fed.Appx. 40 (2nd Cir., 2005), the Second Circuit relied
on Fairbrother v. Morrison, 412 F.3d 39, 56 (2nd Cir., 2005) for setting the standard that a
"materially adverse change in the terms of condition of employment [that] is more
disruptive than a mere inconvenience or an alteration of job responsibilities."  See
Spector v. Board of Trustees of Community-Technical Colleges, 463 F.Supp.2d 234, 248

(D.Conn., 2006). "Under that standard, prototypical examples of adverse employment actions included termination, demotion via a reduced wage, salary or job title, a material loss of benefits, or significantly reduced responsibilities." Id., citing Demerot v. Zegarelli, 451 F.3d 140, 151 (2nd Cir.,2006) (citation omitted).

Even if the Defendants' theory that Said Hajem was not actually refused employment by the NYPD, summary judgment is still inappropriate because Said Hajem's hiring was delayed due to impermissible discrimination. There was and is a real pecuniary harm being done to Mr. Hajem. Had Ramkissoon not discriminated against Said Hajem by not following up on his application, Said Hajem would have easily become a police officer by, at the very least, the January 31, 2007 class. We are here in March of 2009, some two years later. Said Hajem is, at the very least, entitled to the wages he would have had but for Ramkissoon's discrimination. Even Defendant Ramkissoon finds the two year delay to be, "absolutely unusual." (Ram. 111:15 – 111:17)

The cases that are the closest to a delay in hiring are the delay in promotion cases.[7] A case that is informative on how delays in promotions are adverse employment actions under Title VII, is Tierney v. City of New York, 2007 U.S. Dist. Lexis 23217 *70 (S.D.N.Y. March 15, 2007). There, Judge Sweet found summary judgment inappropriate where a number of female detectives had their promotions delayed due to discrimination based upon sex by the NYPD. The City used the exact same arguments there as they are here and were found wanting. The case of Byrne v. Telesector, 2007 U.S. Dist. Lexis 23195 *26-27 (W.D.N.Y. March 27, 2007) is instructive. The court found the line of adverse employment action to be found as, "[t]he majority of courts that have engaged in analysis on this issue appear to consider the relevant inquiry to be whether the alleged

---

[7] Most employers do not claim to have a 4 year review process.

delay in promotion carried with it any identifiable adverse consequences."  Clearly, here Said Hajem has suffered an adverse employment action because he has, at the very least, lost out on two years worth of wages and opportunities.  See also Laing v. CDI Corp., 345 F. Supp. 2d 305, 310 (W.D.N.Y. November 30, 2004).  The Second Circuit has found that the mere loss of the use of wages "would be sufficient for a jury's finding that she suffered an adverse employment action." Lovejoy – Wilson v. Noco Motor Fuel, Inc. 263 F.3d 208, 224 (2nd Cir. 2001).

**Inference of Discrimination**

There is a clear inference of discrimination present in these facts.  Temporality of occurrences gives causal evidence of discrimination.  See Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 224 (2nd Cir. 2001); Richardson v. New York State Dep't of Corr. Serv.,180 F.3d. 426, 446-7 (2nd Cir. 1999); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2nd Cir. 1998).  Ramkissoon calls Mr. Hajem a terrorist and says he does not think foreigners should be allowed to be police officers on July 4, 2006.  The next day he fills out both his Investigators Inquiry Checklist, (Ex. 27), and the Case Review Sheet (Ex. 25).  Ramkissoon claims to have no recollection of these actions (Ram. 73:4 - 22).  These are the actions that caused the discriminatory adverse employment action, even if the direct evidence of this discrimination is not countenanced.  This creates a strong inference of discrimination.

**POINT III**

**THE REASONS DEFENDANT HAS OFFERED TO JUSTIFY ITS**

**DISCRIMINATION AGAINST PLAINTIFF ARE PRETEXTUAL**

The burden-shifting analysis used by courts in considering whether plaintiffs have presented *prima facie* cases of discrimination set forth in McDonnell Douglas Corp. v. Green, 411 US 792 (1973) creates a rebuttable presumption that the employer has discriminated against the employee.  411 U.S. at 802; Scaria, 117 F.3d at 653 (Title VII and ADEA claims are analyzed under the same framework); Burniche, 306 F.Supp.2d at 239.

If the employer offers admissible evidence of a non-discriminatory motive, the plaintiff must then show that the defendant's explanation is pretextual. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-511 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256 (1980); McDonnell Douglas, 411 U.S. at 253.  If plaintiff raises a triable issue of fact as to whether that explanation is pretextual by showing credible evidence to justify a rational finding that the employer's proferred reasons are merely pretextual, and that, more likely than not, the true reason was the illegal discrimination that the plaintiff alleged, summary judgment is inappropriate.  Carlton v. Mystic Transp., 202 F.3d 129, 135 (2nd Cir. 2000); Scaria, 117 F.3d at 654; Holt v. KMI-Continental, Inc., 95 F.3d 123, 132 (2nd Cir. 1996).

This burden is "minimal at this stage of the litigation."  Burniche, 306 F.Supp.2d at 239 (in a discriminatory firing case under Title VII, "'the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination").  "'[T]he governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred.'"  Burniche, 306 F.Supp.2d at 242, quoting James v. N.Y. Racing Association, 233 F.3d 149, 156 (2nd Cir. 2000).

In "'examining the <u>entire record</u> to determine whether the plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff,'" . . . this Court must consider "'<u>the strength of the plaintiff's *prima facie* case, . . . and any other evidence that supports or undermines the employer's case</u>.'"  <u>Burniche</u>, 306 F.Supp.2d at 242 (emphasis added), <u>quoting</u> <u>Schnabel v. Abramson</u>, 232 F.3d 83, 88-89 (2nd Cir. 2000) and <u>James</u>, 233 F.3d at 156.

"To the extent that an actor in defendant's position is unlikely to have proffered a false explanation except to conceal a discriminatory motive, then the false explanation will be powerful evidence of discrimination."  <u>Fisher</u>, 114 F.3d at 1338.  These explanations are simply false on the facts, and constitute clear pretexts for discrimination.

Moreover, in this Court's consideration of the entire record with a view toward determining whether Defendants' explanations for their discriminatory actions are pretextual, "'the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a <u>reasonable inference</u> that prohibited discrimination occurred.'" <u>Burniche</u>, 306 F.Supp.2d at 242 (internal citation omitted).

The evidence that Said Hajem was discriminated against and the NYPD's explanation is pretextual can be found throughout these facts.  First, we can look to the timing issue detailed in the inference section.  Second, we can look at the two years it took for the City to attempt to rectify the situation and reduce their damages, i.e.,  the two years between when Ramkissoon calls Mr. Hajem a terrorist and says he does not like foreign police officers and Rosario's letter to Mr. Hajem asking him about his application.  The total divergence between what was requested by Ramkissoon and

Rosario, shows the pretext in the employment action. Even defendant Ramkissoon testified that it is "absolutely unusual" for there to be no contact between a candidate and an Investigator for the length of time. (Ram. 111:15 – 111:17). All of these items taken together show the defendants' actions were completely pretextual.

## **CONCLUSION**

Ramkissoon called Mr. Hajem a terrorist and then told him he was not hired. Mr. Hajem is more than qualified to be a member of the New York City Police Department. Mr. Hajem's language skills and cultural background make him an ideal candidate to help protect our City from the very real threats of terrorists. Due to Ramkissoon's discrimination against Mr. Hajem, the City of New York has not been afforded the opportunity of his assistance with our security. For these reasons, I respectfully request the Defendants' motion for summary judgment be denied.

Dated:          March 26, 2009
                New York, New York

                                        Respectfully Submitted,

                            By:_____s/_____
                               David B. Rankin (DR 0863)
                               *Attorney for Plaintiff*
                               350 Broadway, Suite 700
                               New York, NY 10013
                               t:212-226-4507

TO:     Jessica Miller, Esq.
        NYC Law Department
        Attorneys for Defendants
        100 Church Street
        New York, NY 10007